

FILED

SEP 16 2005

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| LEVI WALN, a minor by and through JODY WALN, his mother and next friend,<br><br>Plaintiff,<br><br>-vs-<br><br>TODD COUNTY SCHOOL DISTRICT, RICHARD BORDEAUX, Superintendent of Schools, in his Official and Individual capacities,<br><br>Defendants. | CIV 04-3019<br>**2005 D.S.D. 17**<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

[¶1] Plaintiff Levi Waln ("Waln"), by and through his mother, Jody Waln ("Jody"), filed this action alleging that the Todd County School District and Richard Bordeaux ("defendants") temporarily (31 days) deprived plaintiff of his constitutionally protected right to a public education without due process of law. Waln has moved for partial summary judgment (Doc. 29), as to liability, on all three claims in his complaint. Defendants resist the motion for summary judgment and have filed their own motion to dismiss (Doc. 44). Both of these motions are addressed below.

**FACTUAL BACKGROUND**

[¶2] On January 13, 2004, Waln was a 15 year old freshman student at Todd County High School ("Todd County") in Mission, South Dakota, on the Rosebud Indian Reservation. On that date, Waln was involved in a physical altercation involving two or three other male students and various members of the faculty who intervened. Defendants claim that this physical altercation amounted to an "aggravated assault," as set forth in the Todd County Student Handbook.[1]

---

[1] "Aggravated assault" is one of six disciplinary offenses that can be punished by a superintendent's suspension or expulsion. Section 1, Part 1.f. of the student handbook defines

[¶3] Incident reports were completed by Patrick Johner ("Johner"), Carrie Ackerman-Rice ("Rice"), Merrill Feller ("Feller"), and Calvin Waln, Jr. ("Calvin"). The primary fight was between Waln and Preston Blue Bird ("Blue Bird"). No weapons were used in the altercation by any of the students involved. According to the incident report submitted by Johner, Waln and Blue Bird were staring each other down in the bathroom. Johner told them to get to class because the bell was about to ring. Johner's request was ignored, and Blue Bird then said to Waln, "Bring it on mother fucker." At that point, Johner got in between the two of them, and, as he did so, the two boys stepped toward each other. Waln then threw punches over the top of Johner and Blue Bird threw punches back. Despite Johner's attempt to intervene, the fight persisted.

[¶4] According to Rice's incident report, she observed the fight and came rushing over to aid Johner. Both boys continued in their efforts at getting at each other despite the presence of the faculty members. While Johner attempted to handle Waln by pressing him against one wall, Rice was trying to subdue Blue Bird by pushing him back toward another part of the bathroom. Feller and some of the school's juvenile officers soon arrived.

[¶5] With the combined efforts of Feller, Johner, and juvenile officer Jesse Black Elk, they were able to restrain Waln and get him out of the bathroom. As they were removing Waln from

---

aggravated assault as:

> 1. Attempts to cause serious bodily injury to another, or causes such injury under circumstances manifesting extreme indifference to the value of human life;
>
> 2. Attempts to cause, or knowingly causes, bodily injury to another with a dangerous weapon;
>
> 3. Attempts to cause or knowingly causes any bodily injury to a law enforcement officer or other public officer engaged in the performance of the officer's duties;
>
> 4. Assaults another with intent to commit bodily injury which results in serious bodily injury;
>
> 5. Attempts by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm.

the bathroom, Blue Bird's brother, Joe Blue Bird ("Joe"), attempted to hit Waln. Rice also states that Blue Bird, who was constantly throwing punches in the direction of Waln and continuing to struggle to get toward Waln, landed punches on her lower back and arms. Although Waln claims that no one was treated for any injuries as a result of this melee, the defendants note that Rice sustained bruises and soreness from Blue Bird wrenching her arm and has received medical treatment for her injuries.

[¶6] Finally, the fight was brought to an end. Blue Bird was taken to the juvenile diversion office by Calvin. Waln and Joe were taken to Bruce Blanchard's ("Blanchard") office. Blanchard is the school principal at Todd County. Joe continued to threaten Waln in Blanchard's office.

[¶7] On the same date, Blanchard met with Waln and immediately imposed a suspension. Blanchard also attempted to contact Jody on that date but was unable to reach her. He was able to talk with Jody on the phone on January 14, 2004. At that time, Blanchard informed Jody that her son had been involved in a fight and was given a short-term suspension. He also informed her that his recommendation would be for Waln to receive either a long-term suspension or expulsion from school. In December 2003, Waln had been involved in a fight and had been punished with a short-term suspension. At that time, both he and his mother were advised by Blanchard that further fighting could result in another suspension or expulsion.

[¶8] On January 15, 2004, Blanchard wrote a letter to Jody. Blanchard stated that, in accordance with the administrative rules of Todd County, he was suspending Waln from all classes and activities of the high school for "aggravated assault" as defined in the student handbook. Blanchard also informed Jody that "the length of this suspension shall begin immediately and continue throughout the remaining school year." This letter made no mention of a hearing or other procedures that could be employed to challenge the suspension.

[¶9] Some time after that letter was received, Rodney Bordeaux ("Rodney"), Waln's stepfather and Jody's husband, informed Superintendent Bordeaux ("Superintendent Bordeaux") that he and the Walns disagreed with the suspension and wished to challenge it. The defendants had not previously set the matter for any kind of hearing and contend that they were not required to

schedule any hearing before the imposition of a long-term suspension. Rather, they claim that the plaintiff must make a request for such a hearing pursuant to SDCL 13-32-4 and 13-32-4.2.[2]

[¶10] Blanchard wrote a second letter to the Walns on January 28, 2004. It indicated that "the Superintendent suspended Levi for the remainder of the school term," and a hearing with the board of education had been set to discuss the matter further. The hearing was set for Thursday, January 29, 2004, at 5:30 p.m. (one day after the letter was drafted). Although the letter stated that the suspension would be discussed further, the letter gave no impression that Waln or anyone on his behalf was permitted to present evidence or otherwise challenge his suspension. It provided no information about Waln's rights in the hearing or the procedures that would be followed. Nonetheless, Blanchard claims he included a packet of information that he regularly sent out with disciplinary notices with this letter.[3] The packet allegedly contained excerpts from the Todd County handbook[4] and Administrative Rules of South Dakota, Article 24:07: Student Due Process.

[¶11] The Todd County School Board met as scheduled on January 29, 2004. Waln and his family, Superintendent Bordeaux, and Blanchard were present for the meeting. The hearing lasted about 30 minutes. The entire hearing, except the deliberations of the school board, was recorded on audio tape.

---

[2] Curiously, while arguing that plaintiff must request a hearing pursuant to these statutes and arguing that these statutes provide adequate predeprivation procedures, defendants also argue that Waln has no property right in the South Dakota statutory procedures.

[3] It is worth noting that, although Blanchard indicates in his affidavit that these materials were sent with all disciplinary notices, the January 28, 2004, letter gives no specific indication that these materials were included. There is no notation of an enclosure or mention of the packet in the body of the letter.

[4] Defendants include with Exhibit B excerpts taken from the Todd County *2004-2005* handbook. Presumably, taking into account what was set forth in Blanchard's affidavit, the intent of this exhibit is to demonstrate what was sent out to the Walns on January 28, 2004. It makes no sense to suggest that information from a 2004-2005 handbook was sent out during the 2003-2004 school year. Such a document was not yet in existence. It was not yet approved by the Todd County Board and certainly was not applicable to Waln during the pendency of the 2003-2004 school year. Defendants have submitted a sur-reply in an attempt to explain these "miscues."

[¶12] At the hearing, Blanchard made a statement generally summarizing his understanding of the facts surrounding the altercation. Blanchard told the board that Waln had been in a physical altercation with three other boys against him.[5] Blanchard also stated that staff members intervened to stop the altercation and Waln had a confrontation with these staff members. According to Blanchard, the policy of the administration was to always seek a long-term suspension in cases involving students who had confrontations with staff. Waln argues that the accusation at the hearing, namely that Waln had violated a policy prohibiting "confrontations with staff," was not the same as the "aggravated assault" mentioned in the letters sent by Blanchard. Waln claims that "aggravated assault" was not defined, discussed, or even mentioned by anyone at the hearing.

[¶13] Blanchard's statement was largely based upon his reading of the reports and witness statements discussed above. Waln claims that there is nothing in the tape recorded record to suggest that these reports and witness statements were offered into evidence, quoted from, or identified. The defendants dispute this and argue that the statements were provided to the school board. Waln also asserts that the board heard unsworn statements from himself, Jody, Rodney, and the school's Exceptional Education Director, Debera Lucas ("Lucas"), but did not hear statements or testimony from any eyewitnesses to the altercation (other than Waln himself). The defendants do not dispute that Waln was the only actual eyewitness present at the hearing. Waln also claims that no one was asked to take an oath, no witnesses were sequestered, and Waln was not able to question any witnesses because no actual testimony was given at the hearing, other than his own. The defendants counter that an oath or affirmation was administered by the school board president, Randy Her Many Horses, at the onset of the proceedings. The defendants also claim that the audiotape and transcript of the hearing support their contention that individual board members were reviewing written statements provided to them by the administration as well as statements provided to them by Jody.

---

[5] While the Court recalls from the witness statements that Blue Bird and Joe opposed Waln in the altercation, no other names are specifically mentioned. Nonetheless, this fact is apparently not in dispute.

[¶14]   After deliberating in executive session, Waln claims that the school board made no decision as to whether Waln had violated a disciplinary rule. Instead, he claims, the board referred the decision of whether to overturn Superintendent Bordeaux's suspension back to Superintendent Bordeaux, in essence delegating to him the authority to review his own earlier decision and decide the appeal of the long term suspension that he had previously authorized. Defendants contend that the "manifestation determination," as required by Section 504,[6] had not been completed, and final action could not be taken until this procedure was complete. Defendants further argue that completion of the manifestation determination was not possible because Jody, acting on her attorney's advice, refused to take steps toward completing the process.

[¶15]   According to Superintendent Bordeaux, on February 23, 2004, Waln's suspension was rescinded due to the fact that the manifestation determination process had not been completed. Waln was put back in school on February 24, 2004, after having been suspended for 31 school days.

## DECISION

## I.      WALN'S MOTION FOR SUMMARY JUDGMENT

[¶16]   The summary judgment standard is well known and has been set forth by this court in numerous opinions. See Hanson v. North Star Mutual Insurance Co., 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Trip County, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D. 1998), Patterson Farm, Inc. v. City of Britton, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and Smith v. Horton Industries, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D. 1998).  Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); Donaho v. FMC Corp., 74 F.3d 894, 898 (8th Cir. 1996). "Where the

---

[6] Section 504 of the Rehabilitation Act of 1973 requires states that accept federal funding to provide a disabled student with a free and appropriate education. 29 U.S.C. § 794(a); 34 C.F.R. § 104.33. As it pertains to this case, Waln was on what is called a "504 plan," because he suffers from rheumatoid arthritis, Raynaud's, and diabetes. Section 504 requires that the defendants make a determination of whether Waln's misconduct was a manifestation of his physical disability prior to imposing disciplinary sanctions.

unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1326 (8th Cir. 1995). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party. Donaho, 74 F.3d at 898.

[¶17] The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that certain substantive rights - life, liberty, and property - cannot be deprived except pursuant to constitutionally adequate procedures. Cleveland Bd. of Educ. V. Loudermill, 470 U.S. 532, 541 (1985). An essential principle of due process is that a deprivation of life, liberty, or property must be preceded by notice and an opportunity for a hearing appropriate to the nature of the case. Mullane v. Central Hanover Bank & Trust, Co., 339 U.S. 306, 313 (1950). The defendants do not dispute that the laws of the State of South Dakota establish a right to a public education. The United States Supreme Court has characterized such a right as a property interest. *See* Goss v. Lopez, 419 U.S. 565, 575 (1975) ("Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause."). The defendants further concede that, before there can be a significant deprivation of any property right, including the right to a public education, certain minimum due process procedures must be met. In this case, the primary dispute is whether the minimum due process rights vis-a-vis public school disciplinary proceedings were met as to Waln. To determine what procedural protections the Constitution requires in a particular case, the Court weighs several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

[¶18] Waln alleges three counts in his complaint. He argues that the defendants failed to provide him with adequate notice, failed to provide a due process hearing within ten days of his

suspension, and failed to provide a meaningful due process hearing. Waln relies on SDCL 13-32-4, which provides in pertinent part that:

> The school board of every school district shall assist and cooperate with the administration and teachers in the government and discipline of the schools. The board may suspend or expel from school any student for violation of rules or policies or for insubordination or misconduct, and the superintendent or principal in charge of the school may temporarily suspend any student in accordance with § 13-32-4.2.

SDCL 13-32-4.2 provides the procedure for imposition and appeal of suspensions:

> The school board in any district may authorize the summary suspension of pupils by principals of schools for not more than ten school days and by the superintendent of schools for not more than ninety school days. In case of a suspension by the superintendent for more than ten school days, the pupil or his parents or others having his custodial care may appeal the decision of the superintendent to the Board of Education. Any suspension by a principal shall be immediately reported to the superintendent who may revoke the suspension at any time. In event of an appeal to the board, the superintendent shall promptly transmit to the board a full report in writing of the facts relating to the suspension, the action taken by him and the reasons for such action; and the board, upon request, shall grant a hearing to the appealing party. No pupil may be suspended unless:
>
> (1) The pupil is given oral or written notice of the charges against him;
>
> (2) The pupil is given an oral or written explanation of the facts that form the basis of the proposed suspension; and
>
> (3) The pupil is given an opportunity to present his version of the incident.
>
> In the event of a suspension for more than ten school days, if the pupil gives notice that he wishes to appeal the suspension to the board, the suspension shall be stayed until the board renders its decision, unless in the judgment of the superintendent of schools, the pupil's presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process, in which case the pupil may be immediately removed from school, and the notice and hearing shall follow as soon as practicable.

[¶19]   The defendants first claim that these statutes are not applicable to Waln's situation because there is no property right in the procedures adopted by a particular state. They claim that, although there is no question that Waln has a right to due process, "the question remains what process is due." Morrison v. Brewer, 408 U.S. 471, 481 (1972). They urge that the answer to that question is not found in the South Dakota statutes relied upon by Waln. The Court rejects

such argument. Regardless, due process requires exactly what is required in schools all over South Dakota. "A state or governmental body violates due process of law when it fails to follow the procedural steps it has adopted for proceedings held before it." Whiteside v. Kay, 446 F. Supp. 716 (W.D. La. 1978) (*citing* United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954)). In Whiteside, the district court closely examined the applicable Louisiana statutes and concluded that school authorities "followed the Louisiana statutory procedure to the letter in expelling Mr. Whiteside." *Id.* at 719. *See also* Killion v. Franklin Reg'l Sch. Dist., 136 F. Supp. 2d 446 (W.D. Pa. 2001) (school district's failure to provide written notification of suspension to student and reasons for the suspension to student and parents prior to informal hearing was violation of 22 Pa. Code §§ 12.6, 12.8, and student's due process rights), and Montoya v. Sanger Unified School Dist., 502 F. Supp. 209 (E.D. Cal. 1980) (extension of high school students' suspensions, arising out of participation in high school violence, to date of hearing by governing body of high school with respect to potential expulsion of students, constituted separate and distinct suspensions as to which separate hearings were required under state due process and under state statute setting forth grounds for suspension of students).

[¶20]  The defendants also seem to take contradictory positions. At one point in the materials submitted, the defendants argue that they are not required to schedule a hearing on their own volition prior to imposition of a long-term suspension. Rather, defendants claim that the plaintiff "must make a request for such a hearing pursuant to SDCL 13-32-4 and 4.2." Defendant's Response to Plaintiff's Statement of Material Facts, *Response 11*. If the Court understands the defendants' position, Waln is not to be afforded the procedural safeguards set forth in the South Dakota statutes but is required to comply with the provision that he request the hearing. This position is untenable.

[¶21]  Even if Waln is not protected by the South Dakota statutes, in Goss, the Supreme Court noted that "[n]either the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary." Goss, 419 U.S. at 576. The Supreme Court has described the "root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is

9

deprived of any significant property interest." Boddie v. Connecticut, 401 U.S. 371, 379 (1971) (emphasis in original).

[¶22]   In this case, Blanchard suspended Waln on January 13, 2004. The length of the suspension was not indicated at first, but the suspension was imposed immediately after his involvement in the altercation. On January 14, 2004, Blanchard contacted Jody by phone and informed her that Waln was involved in a fight and was subjected to a "short-term suspension." He also told her that a long-term suspension would be recommended. Assuming for the moment that the South Dakota statutes constrained the defendants' ability to suspend Waln, as principal, Blanchard was only authorized to suspend Waln for a period of 10 days if authorized by the school board. *See* SDCL 13-32-4.2. As superintendent, Bordeaux was authorized to suspend Waln for 90 days. *Id.*

[¶23]   Blanchard sent a letter to Jody on January 15, 2004, stating "I am suspending Levi Waln from all classes and activities of the high school for Aggravated Assault as defined in the Student Handbook, Section Part 1f." The letter then went on to state that "[t]he length of the suspension shall begin immediately and continue through the remaining school year." Blanchard claims in his affidavit that the suspension was imposed pursuant to the superintendent's instructions, but his letter unambiguously states that he was imposing the suspension, not Bordeaux.

[¶24]   Since Waln had received a suspension greater than 10 days in length, as of January 15, 2004 (the date he was notified of the long-term suspension), he had the right to appeal the decision of the superintendent, or, the decision of the principal in this case, to the board of education. Waln was not advised of this right by the defendants. In a situation of this nature, the Court agrees with Waln that the defendants shouldered the responsibility of initiating the proper administrative proceedings or at least making Waln aware of what proceedings *could* be initiated if he so chose. At a very minimum, it was incumbent on the defendants to inform Waln that he had the right to challenge the suspension in some sort of an adjudicatory hearing. This should have been done contemporaneously with the original suspension, so that, in the event the suspension was converted to a long-term suspension, Waln would have already been apprised of his options. The defendants' argument that they were entitled to essentially "sit back and wait" to see if Waln would challenge his suspension is backwards. Indeed, it was the defendants who

sought to suspend Waln and, as such, they should have been the parties who alerted him of his rights with respect to that suspension, rather than waiting for him to inquire. *See e.g.* Whisman v. Rinehart, 119 F.3d 1303, 1311 (8th Cir. 1997) ("[T]he state cannot be allowed to take action depriving individuals of a most basic and essential liberty interest which those uneducated and uninformed in legal intricacies may allow to go unchallenged for a long period of time").

[¶25]  Despite not being told of their right to do so, some time after the receipt of the January 15, 2004, letter, Rodney and Jody telephoned Superintendent Bordeaux and indicated that they wished to challenge the suspension. As provided above in SDCL 13-32-4.2, once Waln gave notice of his intent to challenge the suspension, the suspension should have been stayed pending a decision by the board, unless "in the judgment of the superintendent of schools, the pupil's presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process, in which case the pupil may be immediately removed from school, and the notice and hearing shall follow as soon as practicable." There is no evidence of any such finding of a "continuing danger" by Superintendent Bordeaux, and yet, Waln's suspension was not stayed. Waln remained suspended for 13 days school days before he was provided any kind of hearing whatsoever. Additionally, the statute provides that "the superintendent shall promptly transmit to the board a full report in writing of the facts relating to the suspension, the action taken by him and the reasons for such action." The record is devoid of any such written report. There is no question that the defendants failed to comply with the mandates in SDCL 13-32-4.2.

[¶26]  Setting aside the South Dakota statutes, Blanchard's imposition of a suspension through the remainder of the school year without a hearing was clearly improper. In Jennings v. Wentzville R-IV School District, 397 F.3d 1118, (8th Cir. 2005), the Court of Appeals for the Eighth Circuit made the followings observations:

> In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court addressed the due process protection available to students facing temporary suspensions. The Court recognized "[a] 10-day suspension from school ... may not be imposed in complete disregard of the Due Process Clause," because a student's "legitimate entitlement to a public education [is] a property interest" protected thereby. *Id.* at 574, 576, 95 S.Ct. 729. The Court held "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his

side of the story[,]" though "[t]here need be no delay between the time 'notice' is given and the time of the hearing." *Id.* at 581-82, 95 S.Ct. 729. The Court "stop[ped] short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Id.* at 583, 95 S.Ct. 729. *Id.* at 1123-24.

*Id.* at 1123-24.

[¶27] It is clear that Blanchard imposed a suspension to run through the remainder of the school year two days after Waln was involved in the altercation. "Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." Goss, 419 U.S. 584. Prior to Blanchard's suspension, Waln was provided with no meaningful opportunity to deny the aggravated assault charge or present his side of the story. Waln was entitled, at a minimum, to a hearing prior to his short-term suspension being converted to a long-term suspension. *See e.g.* Tillman v. Dade County School Bd., 327 F. Supp. 930 (S.D. Fla. 1971) (after initial suspension for 10 days, students were entitled to hearing prior to additional suspension for 30 days) and Montoya, *supra*, at 213 (extension of a suspension is, under Goss, a separate, distinct suspension requiring a separate hearing).

[¶28] It was not until January 29, 2004, 13 days after Waln's long-term suspension was first imposed, that Waln was provided with something that resembled a hearing. A letter from Blanchard preceding Waln's hearing was dated January 28, 2004. It is clear from the record that the Walns were provided less than one day's notice, as the hearing was set for January 29, 2004. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Memphis Light v. Craft, 436 U.S. 1, 13 (1978) (*citing* Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314 (1950)); *see also* Carey v. Savino, 91 Misc. 2d 50, 379 N.Y.S.2d 311 (Sup. 1977) (where student was notified in evening of one day that hearing would be held the following day at 5:30 p.m., notice was inadequate as a matter of law). The final paragraph of the January 28, 2004, letter provided the possibility that the hearing could be rescheduled. Any rescheduling would have been to the detriment of Waln, as he would have remained suspended

until the hearing was rescheduled. Obviously, the correct course of action would have been to schedule a hearing as soon as the decision was made to impose a suspension rather than waiting until 13 school days into the suspension and then springing it upon the Walns.

[¶29]   Moreover, the January 28, 2004, letter did not indicate that Waln would be "given an opportunity to present his version of the incident." It did not even mention the presentation of evidence or the confrontation of his accusers. Rather, it simply provided that the Board of Education would "discuss this matter further." That parlance could be interpreted a number of ways, but it does not lend itself to an interpretation that an adjudicatory hearing would be available on January 29, 2004.

[¶30]   With respect to the January 28, 2004, letter and the affidavit submitted by Blanchard, the Court is bound to decide the issues presented by this motion without making credibility assessments. Such a role is more appropriately left for the finder of fact. Nonetheless, the inconsistencies in the defendants' submissions are noteworthy. Defendants have been asked many times which documents, if any, were delivered to Waln in an effort to give him notice of his rights to a hearing to challenge his suspension. Throughout discovery, in answers to interrogatories, requests for production of documents, and in an admission pursuant to Fed. R. Civ. P. 36, the defendants consistently stated that they provided Waln with the following written notices as to his procedural hearing rights: the letter of January 15, 2004 from Blanchard, the letter of January 28, 2004, from Blanchard, and the 2003-2004 student handbook. Then, apparently in response to plaintiff's motion for summary judgment, Blanchard remembered that he also included a "packet sent out with all disciplinary notices." Blanchard Aff. ¶ 10. This packet supposedly contained 4 pages from the Todd County Student Handbook and Article 24:07 of the South Dakota Administrative Rules, which is entitled "Student Due Process." The claimed packet was not mentioned in the text of the January 28, 2004, letter, and there was no notation of an enclosure in that letter. These materials effectively spelled out the procedures by which suspensions and expulsions can properly be imposed, including the rights of the student.

[¶31]   It is also interesting that the attachment affixed to Blanchard's affidavit was from the 2004-2005 handbook. This document would not have been applicable when Blanchard sent the letter on January 28, 2004. It is disingenuous for Blanchard to now suggest that he sent a

handbook for the 2004-2005 school year that was not even approved by the Todd County Board until April 26, 2004.[7]

[¶32]   Even if the Court were to accept that this packet of material was provided to Waln, it makes no difference. For one thing, the materials were provided over ten days after the long-term suspension had been imposed. At the point the Walns received this packet, the long-term suspension handed down by Blanchard was already in effect. More importantly, as evidenced by the following paragraphs, the defendants failed to adhere to what is set forth in the materials. Why should the Walns have expected the defendants to follow proper procedure at the point they received the alleged packet? Up to that point, they had done virtually nothing in accordance with the applicable rules.

[¶33]   The Administrative Rules of the Department of Education of the State of South Dakota (hereinafter "AR") set forth basic procedural safeguards to ensure that students are not subjected to arbitrary suspensions by school administrators. For example, when a short-term suspension is utilized, "the pupil must be given the opportunity to answer the charges," and "the principal or superintendent shall give the parent oral notice, if possible, and shall send the parent . . . *a written notice which provides information regarding the pupil's due process rights.*" AR 24:07:02:01 (emphasis added). Assuming that Waln was placed under a short-term suspension beginning January 13, 2004, and ending on January 15, 2004, when his long-term suspension was imposed by Blanchard, the defendants failed to comply in both regards mentioned above. He was given no meaningful opportunity to answer the charges, and the letter of January 15, 2004, set forth nothing to inform him of his due process rights. Indeed, it simply converted his short-term suspension to a long-term suspension. Informing a student of his due process rights *after* imposing punishment is exactly the type of conduct that is prohibited by the Due Process Clause.

---

[7] The text on "Discipline Protocol," which was the section claimed to have been sent to Waln, was changed in the 2004-2005 from its prior version in the 2003-2004 handbook. The pages that Blanchard claims were sent to Waln were taken from the 2004-2005 book. Thus, it was clearly false for Blanchard to assert that he sent the pages affixed to his affidavit. Defendants claim in their sur-reply that the incorrect pages attached to the affidavit and the discrepancies with respect to the packet included with Blanchard's January 28, 2005 letter, were simple miscues.

*See* Boddie, *supra*. Assuming that the packet containing the administrative rules satisfies the requirement that the parents be provided information on the student's due process rights, it was not sent until January 28, 2004, long after the short-term suspension had been converted to a long-term suspension.

[¶34] There are many other areas of noncompliance, especially with regard to the procedures that apply to long-term suspensions. There is no evidence that the superintendent filed "a sealed, written report with the school board by the end of the fifth school day following the first day of the long-term suspension . . ." AR 24:07:03:01. Since Waln's long-term suspension began on Thursday, January 15, 2004, the sealed, written report should have been filed by the end of the school day on Thursday, January 22, 2004. If there was a report, there is no evidence that it was sent to Waln's parents. *Id.*

[¶35] According to AR 24:07:03:01, if the superintendent finds grounds for a long-term suspension from a class or classes, the superintendent may exclude the pupil from classes by using the short-term procedures, but he is to give written notice to the pupil's parent containing, *inter alia*, a notice of the right to request or waive a hearing, a description of the hearing procedure, and a statement that the pupil may present witnesses. AR 24:07:03:01. Providing Waln with notice that the Board of Education would "discuss this matter further" 13 school days after his suspension had commenced does not suffice. While Waln or his parents had the right to waive the hearing under AR 24:07:03:03, there is no evidence that they were told of this right and there is no evidence that they waived it. As for the hearing itself, the administrative rules permit each party to be represented by an attorney, make an opening statement, introduce evidence, present witnesses, examine and cross-examine witnesses, raise objections, and make closing statements. AR 24:07:03:04(2), (3), (4), (8), and (11). Of course, it would have been difficult for Waln to acquire counsel and adequately prepare for such a hearing in a matter of hours.

[¶36] The Court recognizes that "forcing schools to impose 'even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness.'" Jennings, 397 F.3d at 1124 (*quoting* Goss, 419 U.S. at 583.) That said, even if Waln's hearing had been timely, a

15

review of the transcript from the hearing reveals that there was a complete lack of formality. Opening statements were not made. Waln was the only eyewitness present, and, although not necessarily required by law, he had no opportunity to cross examine accusers (i.e. the teachers and others that wrote the incident reports). Rather than discussing the alleged "aggravated assault," the focus was on Waln's "confrontation with staff," a violation which is not even listed as a ground for long-term suspension or expulsion in the 2003-2004 Todd County Handbook. The so-called evidence that was presented basically consisted of a statement from Blanchard in which he recounted the witness statements.

[¶37]   The *coup de gras* of the hearing procedure came when the board of education made no decision at all and referred the decision back to Superintendent Bordeaux, pending the manifestation determination. Ostensibly, the point of the manifestation determination is to ascertain whether the behavior at issue resulted from Waln's qualifying disabilities. If it would have been determined that Waln's conduct was a manifestation of his disabilities, there is no doubt that he would not have been subjected to a long-term suspension of this nature. Rather than staying the suspension pending this determination, Waln remained suspended until February 23, 2004. While the Court is aware that Jody's decision not to cooperate impacted the ability of school officials to make the determination, it is unacceptable that Waln remained suspended in the pendency of this entire process.

[¶38]   Looking at the overall record, there is no issue of material fact as to any claim in Waln's complaint. A long-term suspension was imposed by Blanchard without giving Waln any meaningful opportunity to mount a challenge. Rather than providing Waln with proper notice as to his rights to due process, the defendants opted to sit and wait for Waln to challenge his suspension. When Waln decided to challenge the suspension, the defendants scheduled a hearing and gave Waln one day's notice to prepare to defend himself against a semester-long punishment that had already been imposed. The hearing provided no real opportunity to challenge the suspension and resulted in no final decision as to his suspension. All the while, despite requesting an opportunity to challenge the suspension, Waln remained suspended, "guilty until proven innocent," so to speak. Whether Waln was entitled to the protection of the procedures adopted by the State of South Dakota, the administrative rules adopted by the high schools in

South Dakota, or to the protection of constitutional procedures outlined in Goss and other United States Supreme Court precedent, the defendants' activities to afford Waln due process fell woefully short. Summary judgment as to liability is appropriate as to all three counts in plaintiff's complaint.

## II.     DEFENDANTS' MOTION TO DISMISS

[¶39]   When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted the district count must accept the allegations of the complaint as true and must construe them liberally in plaintiff's favor. Booker v. City of St. Louis, 309 F.3d 464, 467 (8th Cir. 2002), Duffy v. Landberg, 133 F.3d 1120, 1122 (8th Cir. 1998), Whisman el rel. Whisman v. Rinehart, 119 F.3d 1303, 1308 (8th Cir. 1997), and Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996). Dismissal under Fed. R.12(b)(6) is appropriate only when it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997), and Dover Elevator Co. v. Arkansas State Univ., 64 F.3d 442, 445 (8th Cir. 1995). Moreover, all that is required of plaintiff's complaint is a "short and plain statement of the claim" stating why the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a).

[¶40]   The defendants' motion to dismiss raises two arguments. First, they claim that plaintiff's complaint sets out alleged facts of a random, unauthorized deprivation of a property interest, citing Parratt v. Taylor, 451 U.S. 527 (1981), and Hudson v. Palmer, 468 U.S. 517 (1984). Parratt and Hudson are readily distinguishable from the instant case, based upon the reasoning employed by the Supreme Court in Zinermon v. Burch, 494 U.S. 113 (1990). In Zinermon, the plaintiff, who was allegedly medicated and disoriented, signed forms requesting admission to, and treatment at, a Florida state mental hospital. After his release, he brought suit under 42 U.S.C. § 1983, claiming that the defendants deprived him of liberty without due process of law by admitting him as a "voluntary" mental patient when he was incompetent to give informed consent to his admission. The issue was whether defendants' failure to initiate Florida's involuntary placement procedures denied the plaintiff constitutionally guaranteed safeguards. Defendants relied on Parratt and Hudson, claiming that plaintiff's complaint failed to state a claim under § 1983 because it alleged only a random, unauthorized violation of the Florida

statutes governing admission of mental patients. The Supreme Court rejected defendants' argument, distinguishing Parratt and Hudson:

> It may be permissible constitutionally for a State to have a statutory scheme like Florida's, which gives state officials broad power and little guidance in admitting mental patients. But when those officials fail to provide constitutionally required procedural safeguards to a person whom they deprive of liberty, the state officials cannot then escape liability by invoking *Parratt* and *Hudson*. It is immaterial whether the due process violation Burch alleges is best described as arising from petitioner's failure to comply with state procedures for admitting involuntary patients, or from the absence of a specific requirement that petitioners determine whether a patient is competent to consent to voluntary admission. Burch's suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws. *Burch is not simply attempting to blame the State for misconduct by its employees. He seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue.*

Id. at 135-36 (emphasis added).

[¶41]   The Supreme Court went on to note that there were three things that distinguished Zinermon from the other cases. First, unlike Parratt and Hudson, the deprivation in Zinermon was not unpredictable. Id. at 136. Second, a predeprivation process capable of addressing the problem was possible in Zinermon. Id. Third, the conduct of the defendants was not "unauthorized," as it was in Parratt and Hudson. Id. at 137.

[¶42]   There are a few aspects of the instant case that make it more analogous to Zinermon and make the Parratt and Hudson cases inapplicable. In cases like Parratt and Hudson, there was simply no way to predict the random acts of property deprivation, occurring by way of the negligence or intentional acts of low-level prison employees. However, in the instant case, the action taken by the defendants was not triggered until a violation of school policy occurred. Accordingly, the action taken after the violation is somewhat predictable. The disciplinary process is, at least ostensibly, a deliberative and calculated process governed by statutes and administrative rules. In Zinermon, the Court considered the discretion given to those who admitted the plaintiff into the mental hospital "voluntarily." Similarly, in this case, had the defendants' power to suspend students such as Waln been more carefully administered, the deprivation here may have been averted. "[I]t would indeed be strange to allow state officials to

escape § 1983 liability for failing to provide constitutionally required procedural protections by assuming that those procedures would be futile because the same state officials would find a way to subvert them." Zinermon, 494 U.S. at 137-38.

[¶43] Additionally, in Parratt and Hudson, the prison employees had no authority to deprive prisoners of property, and no similar duty to initiate the procedural safeguards required before deprivations occurred. In the instant case, it is clear that the principal and superintendent were both vested with the authority to impose suspensions and were charged with making a due process hearing available to students who desired to challenge the suspension. *See e.g.* SDCL 13-32-4.2. As in Zinermon, the deprivation that occurred with respect to Waln was unauthorized "only in the sense that it was not an act sanctioned by state law, but, instead, was a 'deprivation of constitutional rights . . . by an official's abuse of his position." *Id.* at 138 (*quoting* Monroe v. Pape, 365 U.S. 167, 172 (1961)).

[¶44] Defendants also argue that there was no violation of due process here because Waln had a meaningful post-deprivation remedy. This argument can be summarily disposed of given the dissimilarity of this case to Parratt and Hudson. In those cases, it was clear that the state had no ability to provide predeprivation process because of the random and unpredictable nature of the deprivations. "In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." Zinermon, 494 U.S. at 132.

[¶45] Intuitively, it makes no sense to reward the defendants for their failure to adhere to the statutory scheme adopted by the state of South Dakota, but that seems to be what the defendants are asking the Court to do. The Court rejects any contention that Waln was entitled to lesser rights than a similarly situated student in another South Dakota school. The reasoning employed in Parratt and Hudson makes sense under the facts of those cases but is ill-suited for a situation such as the one here presented. If nothing else, extending the reasoning in those cases to the instant case would provide no incentive for school officials to adhere to state statutes and administrative rules governing student due process. Any violation of those statutes could be said to be "random" and "unauthorized." In short, the defendants cannot escape § 1983 liability by characterizing their conduct as a "random, unauthorized" violation which the State was not in a

position to predict or avert, so that all the process Waln could possibly be due is a postdeprivation remedy. *See* Zinermon, 494 U.S. at 138.

[¶46]  Defendants also claim that Waln has failed to allege any set of facts as to Superintendent Bordeaux upon which relief may be granted. Construing the complaint liberally, Waln states valid claims against Bordeaux, which, if proven, would entitle Waln to relief.

## ORDER

[¶47]  Now, therefore, based on the foregoing,

[¶48]  IT IS ORDERED:

    (1)  The plaintiff's motion for summary judgment as to liability, Doc. 29, is granted.

    (2)  The defendants' motion to dismiss, Doc. 44, is denied.

    (3)  The defendants' motion for leave to submit a sur-reply brief, Doc. 53, is granted.

[¶49]  Dated this 16th day of September, 2005.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: Barbara J. Paepke
DEPUTY
(SEAL)